## ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. HUDSON et al. (No. 3178.)

(Court of Civil Appeals of Texas. Texarkana. March 17, 1926. Rehearing Denied March 18, 1926.)

**1. Appeal and error ☞989—Court of Appeals, in testing sufficiency of evidence to support jury's finding, must look to testimony on which jury had right to rely.**

In testing sufficiency of evidence to support jury's findings, Court of Appeals must look to testimony on which jury had right to rely.

**2. Commerce ☞82—Issuance of proclamation, under Open Port Law, is not required to make violence denounced in penal provisions therein public offenses (Rev. St. 1925, arts. 907–911; Pen. Code 1925, arts. 1094–1100).**

Issuance of proclamation by the Governor, as provided for in the Open Port Law (Rev. St. 1925, arts. 907–911), is not required to make form of violence denounced in penal provisions (Pen. Code 1925, arts. 1094–1100), public offenses; purpose of proclamation being to segregate territory over which Governor assumes exclusive police supervision through state rangers.

**3. States ☞68—Ranger has no more authority than is vested in local police officers, except as to territory covered.**

A ranger has no more authority as police officer than is vested by law in local police officers, except as to territory which he may cover.

**4. Railroads ☞281(1)—Railroad is not liable for official conduct of state ranger, furnished during strike, but is liable for unofficial conduct (Rev. St. 1925, arts. 907–911; Pen. Code 1925, arts. 1094–1100).**

Railroad company, furnished with state rangers during strike, under authority of Open Port Law (Rev. St. 1925, arts. 907–911, and Pen. Code 1925, arts. 1094–1100), but on condition that railroad paid salaries of rangers, is not liable for official conduct of ranger, but is liable for unofficial conduct, even though done without specific directions.

**5. Officers ☞103.**

Officer has no more right than private citizen to invade private premises of another, except in performance of official duty.

**6. Railroads ☞282(5)—Evidence held sufficient to support verdict against railroad for homicide by state ranger, furnished during strike (Rev. St. 1925, arts. 907–911; Pen. Code 1925, arts. 1094–1100).**

In action to recover for death of son killed by state ranger, furnished railroad company during strike, under authority of Open Port

Law (Rev. St. 1925, arts. 907–911; Pen. Code 1925, arts. 1094–1100), salaries of rangers being paid by railroad, evidence *held* sufficient to support verdict against railroad company.

**7. Death ☞99(5)—$7,000 to mother for death of 27 year old son held not excessive.**

$7,000 verdict to 50 year old mother for death of 27 year old son, who was her sole support and furnished her about $100 per month, *held* not excessive.

**8. Death ☞99(5)—$2,500 to father for son's death held excessive and reduced to $500.**

$2,500 verdict to aged father for son's death *held* excessive and reduced to $500, where only money ever shown to have been given to father by son was $10.

Appeal from District Court, Smith County; J. R. Warren, Judge.

Suit by W. H. Hudson and another against the St. Louis Southwestern Railway Company of Texas. Judgment for plaintiffs, and defendant appeals. Affirmed on condition of remittitur.

Marsh & McIlwaine and Bryan Marsh, all of Tyler, for appellant.

Edwards & Hughes, of Tyler, for appellees.

HODGES, J. In July, 1922, there occurred what is commonly known as the railway shopmen's strike. The appellant owned at that time repair shops at Tyler, Tex., in which several hundred men were employed. A large number, if not all, of those employees, joined the strike and quit work. Being apprehensive of injury to its property and interference with its railway operation by the strikers or their sympathizers, appellant, through its attorneys, applied to the Governor of Texas for a troop of rangers to act as guards for protection against such violence and interference. The Governor consented to send rangers, provided the appellant would pay their salaries, giving as a reason for this condition that no appropriation for that purpose was available. About September 15, 1922, a body of approximately 30 rangers were sent to Tyler and stationed within and about appellant's shops and yards. On or about October 7, one of those rangers, one L. W. Pearce, shot and killed Clayton Hudson, a son of appellees W. H. and Rosa Hudson. The circumstances under which the killing occurred showed that it was unprovoked and unjustifiable.

Suit was later filed by the appellees against the appellant to recover the resulting damages. It was alleged in their petition that Pearce was an employee of the appellant, acting as a guard of its private property and in the furtherance of his employment at the time he committed the homicide. It was also alleged that Pearce was a dangerous and violent man; that the appellant

knew that fact, and negligently retained him in its service as a guard.

Appellant pleaded as an answer the existence of the strike; that its property and operation were menaced by threatened violence from the strikers and their sympathizers; and that, in order to protect its property, and to enable it to continue the uninterrupted operation of its road as a common carrier, it applied for and secured in a lawful manner a number of state rangers to act as guards to prevent the threatened violence. It further alleged that Pearce was one of those legally appointed rangers; that he was subject only to the orders and authority of the regularly appointed captain of the ranger force, and was in no sense its private employee, nor was he at the time of the killing performing any service for the railway company. It also averred that the killing of Hudson by Pearce was the result of a private difference between Pearce and the deceased, wholly unconnected with any legal duty which Pearce had engaged to perform for appellant.

The court submitted to the jury the following special issues: (1) Was Pearce an employee of the defendant company on the occasion and at the time Hudson was killed? (2) Was he at that time acting within the scope of his employment? (3) Was the killing of Hudson by Pearce a wrongful act? (4) Was Pearce a person unfit for the service, if any, he was employed by the defendant to perform? (5) Could the defendant or its officers, by the exercise of ordinary care, have ascertained before the killing of Hudson that Pearce was a person unfit (if he was unfit) for the service, if any, in which he was employed by the defendant company at the time of the killing? (6) Was such unfitness, if any, a proximate cause of the death of Hudson? (7) Was the appellant, its agents, and servants guilty of negligence in permitting Pearce to be and remain in the service, if he was, at the time of the killing? (8) Was such negligence of defendant, if there was any, a proximate cause of the death of Hudson? All of those questions were answered in the affirmative. The jury, in answer to other questions, fixed the aggregate damages to the appellees at the sum of $9,500.

The main ground here urged for a reversal of the judgment is that the evidence is insufficient to support the findings of the jury in regard to Pearce's employment and his relations to the appellant. It is insisted that the evidence conclusively showed that Pearce was a public officer, regularly appointed, was acting solely as an officer, was in no way responsible to the appellant for his conduct, and was not under its control in any of the details of the service he was performing or was engaged to perform.

As authority for the sending of rangers to guard its property and prevent interference with its commerce, counsel for appellants refer to what is known as the "Open Port Law," enacted in 1920 at a called session of the Legislature. The penal provisions of that act appear as chapter 10 of title 14 of the Revised Penal Code of 1925. Other provisions of the act are found in the Revised Civil Statutes of 1925, appearing as articles 907 to 911, inclusive. Article 907 is as follows:

"If at any time the movement of commerce by common carriers of this state or any of them, is interfered with in violation of the provisions of chapter 10, title 14, of the Penal Code, and the Governor, after investigation, becomes convinced that the local authorities were failing to enforce the law either because they were unable or unwilling to do so, the Governor shall, in order that the movement of commerce may not be interfered with, forthwith issue his proclamations declaring such conditions to exist and describing the area thus affected."

Article 908 provides that upon the issuance of the proclamation the Governor shall exercise full and complete police jurisdiction over the area described in his proclamation, and such police jurisdiction shall supersede the police powers of the local authorities, provided that the Governor shall not disturb the local officers in the exercise of police jurisdiction outside of the designated territory. Article 910 authorizes the Governor to use the state rangers in the enforcement of the provisions of the law. It further provides that, if a sufficient number of rangers is not available, the Governor is authorized to employ others for that purpose, and that such other persons shall have all the powers and authority of the regular rangers and shall be paid the same salary as rangers out of the appropriations made to the executive office for the payment of rewards and the enforcement of the law. The penal provisions of the law are as follows:

"Art. 1094. It shall be unlawful for any one by or through the use of any physical violence or by threatening the use of any physical violence, or by intimidation or threatening destruction of his property to interfere with or molest or harass any person or persons engaged in the work of loading or unloading or transporting any commerce within this state.

"Art. 1095. It shall be unlawful for any two or more persons to conspire together to prevent or attempt to prevent, by the use of physical violence or intimidation or by threats of physical violence or by abusive language spoken or written to any person engaged in loading or unloading or transporting any commerce within this state, any person from performing the duties of such employment.

"Art. 1096. Every person who shall through any act or written communication or conversation with any person or persons engaged in loading, unloading or transporting any commerce by any common carrier in Texas, or with the father, mother, wife, sister, brother, child or children of such person or persons while so engaged, or during the hours of day or night while not engaged in such work and when employed for such work, which is reasonably calculated,

(282 S.W.)

intended or designed to cause such person or persons so engaged to desist from performing such work through fear of physical violence or destruction of his property, shall be deemed to have intimidated, molested or harassed such person or persons engaged in the work, of loading or unloading or transporting commerce within this state. * * *

"Art. 1099. Any person violating any provision of this chapter shall be fined not less than one hundred nor more than one thousand dollars, or be imprisoned in jail not less than thirty days nor more than one year, or both. Should any person violating any provision of 'this chapter use any physical violence upon, or threaten the life of any person engaged in the work of loading or unloading, or transporting any commerce, as defined in this chapter, he shall be confined in the penitentiary not less than one nor more than five years."

[1] Counsel for appellees question the regularity and validity of the appointment of Pearce and other rangers associated with him; but we shall pass over that objection as being without controlling importance, and shall dispose of the issues presented upon the assumption that Pearce was legally and regularly appointed a member of the state ranger force and was sent to Tyler by authority of the Governor. The mere fact that Pearce was an officer of the state and had been authorized and commissioned by the Governor to go to Tyler and there perform the duties imposed by law upon peace officers generally, or that of rangers specially, is not decisive of the issues involved in this controversy. The important inquiry is, What were his special relations to the appellant? What, if any, special services had Pearce been engaged or directed to do for the benefit of the appellant, which the law did not require him to do as a public officer? And was he acting in furtherance of such service at the time he committed the homicide? The testimony upon those issues was voluminous, and in many important details was conflicting. In testing the sufficiency of the evidence to support the findings of the jury, we must look to the testimony upon which the jury had a right to rely.

The following are extracts taken from the testimony of Jack Boyd, a witness for the appellees, who, it appears, was a strike breaker:

"In my work around the yard I noticed Pearce's character of work. I saw him around Mr. Peasley's office and Mr. Kirkland's office. Mr. Peasley had general control and supervision of the shop grounds, and Mr. Kammerlin was Mr. Peasley's chief clerk. I have heard Pearce get his orders from Mr. Kammerlin. That condition obtained during the time when I first met Pearce in September, the 7th, up till the time he killed Hudson. * * * Often I would see Pearce in Peasley's or Kirkland's office as I would go up for goggles or gloves. As to who gave Pearce directions, there were several of them, including Mr. Wilmer, who was a special agent or guard for the Cotton Belt. Another man was Mr. Holbert, who was also a guard for the Cotton Belt. * * * I think Mr. Holbert was some kind of a chief special agent for the Cotton Belt. They got orders from him. I don't know who else gave orders, except Mr. Kirkland and Mr. Kammerlin. I never saw Mr. Peasley give orders. From the 1st of September to the 7th of October, 1922, the ranger guards were stationed, or some of them, at all the entrances to the shops, and some scattered all about through the shops all the time. As a rule there were two of them at every entrance to the shop, and at every picket station. They were placed there to guard the company's employees and the company's property. They were to keep the pickets from interfering with the workmen. * * * I have seen Mr. Kammerlin go around with Pearce, and a big fellow named Sparks went with them too. * * * What was Pearce's duties there, and what he did with reference to the posts where those ranger guards were stationed there at picket posts, as to what he did was nearly every day he would make those rounds of all the picket stations. He would go around every morning, see that all the guards was on duty, and sometimes he would stay all around the depot until everybody got in to work, and all the time men got off duty and got away. * * * I saw Mr. Kammerlin go around with Pearce and say: 'We want to keep men at this gate, and you want to keep men up at that gate.' I have seen him make the rounds lots of times with Pearce. * * * Mr. Holbert was a special guard for the company, and these rangers and guards they got orders—they had 3 or 4 men that got their orders from Mr. Wilmer and Mr. Pilkington, but Pilkington was not in town very much; he was also a special agent for the company. I worked there all the time and was acquainted with Pilkington, and it was generally understood that he was chief special agent for the Cotton Belt. I have been with them at night, and heard Holbert and Pilkington give orders and talk the work over. * * * I have heard Holbert say: 'You put two men here at this gate, put two up there by the little oil station over there, put two up here at those steps, keep two here by the depot, and at all the entrances to the shops, keep them up.' I know whether or not from my observations those instructions would be obeyed. I saw Holbert make the rounds with Pearce. I won't say it was a daily occurrence, but it was regular. * * * I have on some occasions, or occasion, heard Holbert there give Pearce some directions as to his work. A few days before the killing I heard Pearce and Holbert having some conversation of some character there with reference to the picket lines. * * * I heard Pearce say, or make some statement in Holbert's presence about the picket lines. * * * Pearce and Holbert were talking about those pickets were getting bad. They were discussing the picket lines; then Pearce said: 'We will kill one or two of the sons of b—— and we will stop them. We will get our bluff in on them.' * * * That was just a night or two before the killing of Hudson."

This witness also testified, in substance, that he saw the shooting of Hudson by Pearce. He was in the inspector's shanty at the International & Great Northern Railway track, about 20 or 25 feet from the main line.

of the International & Great Northern Railway, at a point where Pabst street crosses the railway. On the west side of the shanty were two big windows, and on one of them was written in big letters, "Scabs wanted." Pearce passed by and saw that writing, and walked up to where Hudson and another one of the pickets were sitting or standing. Hudson was at the time squatting down on the ground. The first thing Pearce said was: "Which one of you G—— d—— sons of b—— put that sign on that window?" And he ,pointed to the sign. Hudson said: "We didn't do it," or, "I don't know." Pearce then walked over to where Hudson was, and said to him, "G—— d—— you; didn't I tell you to keep off of here and quit meddling around here with the company's business? I told you I was going to kill you," and pulled out his six shooter and shot Hudson. The latter fell over and expired almost immediately.

Peasley, the superintendent of appellant's motive power at Tyler, testified that the business of the rangers was to keep people out of the shop grounds; that the pickets were put on duty on the 13th day of July, and were when Hudson was killed. He never instructed anything to prevent the picketing, because it was his understanding that peaceful picketing was permissible and it was the right of the strikers to do that.

McKinney testified by deposition that he went to Tyler under instructions to report to Captain Brady. On his arrival he received a commission. The service he rendered was guarding the railroad property, keeping out intruders and trespassers, and protecting the company's working men and looking after railroad property inside the shop yards. The head man of the rangers would confer with special agents and the other company officials, Mr. Peasley and his chief clerk, Mr. Kammerlin. Passes were issued by Peasley or his chief clerk in order to admit people within the shop grounds. Pearce had charge of the stationing or placing of men in the daytime, and was frequently seen in company with Holbert and Kammerlin. He (Pearce) met all the in-coming and out-going employees, searched their luggage and baggage, and checked them in and checked them out, particularly as they left the service of the company. He frequently saw Mr. Kammerlin talking with Pearce with reference to the work. He was working under the direction of Mr. Kammerlin, who is Mr. Peasley's chief clerk. This witness also testified that he was acquainted with the reputation of Pearce in and about the city of Tyler; that he had the reputation of being a dangerous and violent man. He further testified that:

"We, the rangers, looked to the captain for all our orders, and we also tried to carry out the wishes and suggestions of the defendant company. We did everything our captain asked us to do, and we also did everything that the special agents of the defendant company requested us to do."

He further stated:

"I did not, while engaged in the service before the death of Hudson, receive any special instructions from the defendant, or any of its officers or agents or special agents or deputy special agents, as to my conduct towards the striking employees of the defendant, or their pickets, or to any person or persons who might be on or near the railway property without being an employee of the defendant company. But it was generally understood that we were to handle them very roughly."

[2, 3] The evidence justified the jury in concluding that at the time the rangers were applied for and sent to Tyler, and prior to the killing of Hudson, no lawful violence had been done, or threatened, against the property or the employees of the appellant. The hostility of the strikers was apparently limited, so far as the appellant was concerned, to peaceful picketing. The evidence does show that some time after the strike began, and before the rangers were sent, two employees of the International & Great Northern Railway Company at Tyler had been violently dealt with by parties who were either strikers or their sympathizers. Up to the time of the killing of Hudson the Governor had not issued any proclamation as provided for in the "Open Port Law." However, the issuance of such a proclamation was not required in order to make the form of violence denounced in the penal provisions of that law public offenses. The main, and probably the only, purpose of an executive proclamation is to segregate certain territory over which the Governor assumes exclusive police supervision to be conducted through the agency of state rangers. A ranger has no more authority as a police officer than is vested by law in the local police officials, except as to the territory which he may cover.

According to the testimony which has been quoted, and much more that might be quoted, Pearce had engaged and was endeavoring to do more than merely suppress unlawful violence. The force to which he belonged was sent to Tyler at the instance of the appellant's representatives. The members of the force were stationed within the inclosed premises of the appellant, in quarters provided by appellant for that purpose, and were paid by it for all of the services rendered, whether official or unofficial. The rangers took orders from appellant's officers who were in charge of the local property. While not directed to suppress picketing, the rangers were expected to discourage it. According to one witness, they were to "handle the pickets roughly." That carried with it an implication that the rangers were to do something to, or toward, the pickets. Peaceful picketing, while not unlawful, is a form of industrial warfare that may, and often does,

(282 S.W.)

seriously interfere with the efficient conduct of the railway service. The effectual obstruction of railway operation is doubtless the chief end sought to be accomplished by the process known as picketing. The removal of pickets would necessarily remove a situation more or less embarrassing to the appellant as a common carrier. Hence intimidation which would tend to drive pickets away from appellant's property, or its vicinity, would be beneficial to appellant's business. That is, apparently, what Pearce conceived to be in the line of his duty. The evidence tends to show that he was probably encouraged in some way by appellant's agents to interfere with picketing. The unlawful act which forms the basis of this suit was not committed in the performance of any official duty as a ranger.

[4] While the appellant cannot be held liable for the official conduct of Pearce, it may be held liable for his unofficial conduct which he had engaged to do, even though he committed the unlawful act without specific directions. T. & N. O. Ry. Co. v. Parsons (Tex. Civ. App.) 109 S. W. 240; Id., 113 S. W. 914, 102 Tex. 157, 132 Am. St. Rep. 857; Lancaster v. Carter (Tex. Civ. App.) 237 S. W. 634. Many other cases of similar holdings are to be found cited in those above referred to.

[5, 6] It is insisted that the relation of employer and employee did not exist between the appellant and Pearce, because the appellant had no power to discharge Pearce. It is true the appellant could not discharge him from the ranger force, or deprive him of his authority to arrest violators of the law, but it could have stopped the payment of his salary, and might have compelled him to leave its premises, since there were no existing or threatened disorders which required his presence as a police officer within its grounds. The authority to prevent the entrance of trespassers within those inclosed premises was derived from the appellant, and not from the law. An officer has no more right than has a private citizen to invade the private premises of another, except in the performance of some official duty. We are of the opinion that the evidence, while conflicting, was sufficient to support the verdict upon which the judgment was founded.

[7, 8] Complaint is also made that the judgment is excessive. The father and mother of the deceased were the only parties plaintiff in the suit. They were not living together as husband and wife at the time their son was killed. The mother testified that she was 50 years old, and that her son was 27 years old at the time he was killed. He had no wife or children, and was taking care of and supporting his mother. While employed at the shops he furnished her about $100 per month to run the house and for other expenses. From the time he went out on the strike up to the time he was killed he had not furnished anything. He had always told her that he would never marry as long as he and she lived, unless he was sure that he could get a woman that would let him take care of his mother. He was a coppersmith by trade, and since he began working for wages his earnings at the time of the strike amounted to somewhere between $150 and $175 per month. In apportioning the verdict the jury awarded her $7,000. W. H. Hudson, the father, testified that he was 75 years old and was living with his son-in-law. He was, at the time his son was killed, unable to do any physical labor, and was dependent upon his children. The deceased had on one occasion given him $10, and that was the only money ever received from his son. The jury awarded him $2,500. We are inclined to think the verdict was not excessive in the award allowed the mother, taking into consideration what the deceased had done for her in the past and what he would probably do in the future. Considering, however, what he had done for his father, and the life expectancy of the latter and his situation at the time, the allowance to him of $2,500 was more than the circumstances warranted.

The judgment will be affirmed on the condition that the appellees remit, within 15 days, the sum of $2,000 awarded to W. H. Hudson; otherwise the judgment will be reversed, and the cause remanded.